UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SEBASTIEN BEJIN, A/K/A "BASH"<br><br>Defendant | Criminal No. 23-CR-10297-PBS |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**

The government submits this memorandum in support of its recommendation for **168 months of incarceration** for the Defendant, followed by five years of supervised release. This recommendation reflects the seriousness of the offense, the need for deterrence and punishment, and is sufficient but no greater than necessary to accomplish the goals of sentencing. The government's recommendation reflects a sentence that is consonant with justice and accords with the sentencing factors under Section 3553(a).

**THE ADVISORY SENTENCING GUIDELINES**

The government disagrees with the offense level calculation provided by U.S. Probation, which calculated the offense level in the final Presentence Report to be 37 (PSR ¶¶130-139). With an agreed-to criminal history score of one, the criminal history category is I (PSR ¶¶142-144). Therefore, the guideline sentencing range ("GSR") calculated by Probation is 210 to 262 months (PSR ¶189).

The Plea Agreement entered into by the parties under Fed. R. Crim. P. 11(c)(1)(C) calls for a sentencing range of 144 to 168 months, which is below the GSR as calculated by Probation. The Parties offense level calculation in the Plea Agreement reflects an increase of +2 offense levels that were not found by Probation. Compare PSR ¶¶130-139 with ECF #93 (Plea Agreement

1

increasing offense level by 2 based on use of violence (USSG § 2D1.1(b)(2)). The Sentencing Range of 144 to 168 months agreed-to by the Parties reflects a downward variance irrespective of whether the Court were to adopt the Parties' calculation or Probation's calculation. Probation elected to not include the 2-level enhancement for use of violence, despite multiple instances where cooperating witnesses described the Defendant discharging firearms at others.

The government also notes that this Plea Agreement reflects a charging concession. Should the Court accept the binding Plea Agreement, then the government has agreed to dismiss Count Three, which charges the Defendant with violating 18 U.S.C. § 924(c), and which carries a mandatory consecutive 60-month sentence. *See* ECF #93, p. 1.

### ARGUMENT

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). Among those factors are the "nature and circumstances of the offense," promoting respect for the law, and providing just punishment. See 18 U.S.C. § 3553(a)(2)(A). The sentence must also afford "adequate deterrence" for both the defendant and others. See 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct"). Lastly, the sentence must protect the public from the further crimes of the Defendant. See 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant"). Consideration of the § 3553(a) factors demonstrates that a sentence of 168 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

### A.   Nature and Circumstances of the Offenses

As described in the presentence report, the Defendant was involved in distributing an enormous quantity of drugs as part of a drug trafficking organization ("DTO") that was operated

by codefendant EMILIO GARCIA. The drug trafficking organization controlled multiple locations, including a stash location and clandestine laboratory. As the cooperating witnesses noted, multiple runners were employed by the DTO and those individuals sole job was to deliver multiple kilograms of pills and powder per day to customers at prices and amounts set by GARCIA. The DTO was compartmentalized, and the runner did not communicate with the customers. The DTO used dedicated vehicles with hidden compartments procured specifically to facilitate the transportation and distribution. In addition to the size and scale of the operation, the drugs that were distributed were linked to at least one overdose death. *See* PSR ¶¶18-22.

The amount of drugs seized from the DTO is truly staggering and warrants further specific description:

- In November 2022, the Massachusetts State Police investigation recovered over 60 kilograms of fentanyl, methamphetamine and cocaine, and three firearms from a stash location controlled by the DTO. *See* PSR ¶¶14-15.

- When the former leader of the DTO, Pedro Lopez was arrested in May 2023 in a Honda Accord with a hidden compartment, approximately $40,00 cash was located, along with another kilogram of methamphetamine. *See* PSR ¶¶14-17.

- In July 2023, during the overdose investigation, over 300 grams of methamphetamine and firearm were recovered. *See* PSR ¶¶18-30.

- In October 2023, investigators conducted two controlled purchases from the Defendant himself, that totaled 3,500 grams of methamphetamine. *See* PSR ¶¶38-51.

- On November 1, 2023, at 363 Broadway investigators seized over 18 kilograms of fentanyl, 37 kilograms of methamphetamine, 7.7 kilograms of fentanyl analogue, and nearly a kilogram of cocaine. Along with the controlled substances, another 30 kilograms of cutting agents were also located. *See* PSR ¶58-71.

- On November 1, 2023, at 341 Western, investigators seized 1.4 kilograms of fentanyl and 1.8 kilograms of methamphetamine. *See* PSR ¶¶72-75.

- On November 6, 2023, during a second search at 341 Western Avenue, investigators located a clandestine drug laboratory, with multiple industrial-grade pill presses (including one which was a rotary style press capable of producing over 10,000 pills per hour). Also within the same lab space, investigators located multiple storage bins filled with suspected fentanyl and methamphetamine compounds. In total the storage bins containing the suspected fentanyl and methamphetamine compounds weighed over 100 hundred pounds. Over 700 grams of fentanyl and 3.7 kilograms of

3

methamphetamine were sent for testing and confirmed by the laboratory. *See* PSR ¶¶77-86.

This amount of drugs, of course, was just what the DTO kept on hand during a few days of seizures.  On a daily basis this DTO moved multiple kilograms – tens of thousands of pills -- and generated thousands of dollars in cash.  Multiple cooperating witnesses described distributing dozens of kilograms of fentanyl, methamphetamine and cocaine in pill and powder form per week. *See* PSR ¶¶98-124.   These witnesses variously worked at the direction of GARCIA, until approximately October 2023, when the Defendant became the full-time runner for the DTO until his arrest in November 2023.  Though the full-time runner for about a month, the Defendant was associated with the DTO historically.  Extrapolating the DTO's operation and applying the average weights, there is no question that the DTO far exceeded even the highest threshold under the guidelines for drug weight for both fentanyl and methamphetamine on a weekly basis. Consequently, even if considered for the month in which he was full-time runner, the Defendant is personally responsible for distributing drug weights well-above even the highest threshold.

Beyond the drug weight, this was also an extremely well-armed organization as well.  In total, over 10 firearms were recovered during the various searches. This includes a firearm recovered from the Defendant's vehicle in a compartment that also contained his wallet. *See* PSR ¶22.

Based on the nature of the crimes, a significant period of incarceration is called for. The Defendant has acknowledged this through the Plea Agreement and the sentencing range proposed by the Parties. In short, this sentencing range properly accounts for this drug quantity and firearms. This is also a sentence that acknowledges the Defendant's lack of criminal history, his relative role in the DTO, and his acceptance of responsibility in pleading guilty without litigation, and agreeing to more than a decade in prison as a first period of incarceration.

4

**B.       Criminal History, Specific Deterrence, Punishment**

This is the Defendant's first criminal conviction. He has not served any prior sentences, and his first will be well over ten years under the terms of the Plea Agreement.  This sentencing range is well earned through the drug weight and multiple firearms. Nevertheless, there is a measure of leniency in the Defendant avoiding the potential of fifteen years of mandatory minimum prison time in this case.

The government believes that specific deterrence will be well-served by this below-guideline sentence.  More than a dozen years in prison for the Defendant's first substantive conviction should deter him from crimes in the future. Unlike many other offenders who present with lengthy criminal histories, this is a serious sentence imposed at the beginning of the Defendant's involvement in the criminal justice system, when deterrence can be most effective. The Defendant's employment history is sporadic employment and marked by extended period of unemployment. This sentence will account for the Defendant's conduct and lack of productive work history and hopefully adjust the Defendant's mindset and thinking toward productive employment and work.

The sentence also serves the goal of punishing the Defendant. The 168 month term reflects the proper measure of punishment. Twelve years is not a small portion of an individual's life, and it will have the desired effect of achieving a just punishment.

**C.       General Deterrence, Promotion of Respect for the Law, and Public Protection**

General deterrence and promotion of respect for the law must also be considered, and this Court should be mindful of the message that the sentence will send to drug dealers, gang members, and those who wield firearms while dealing drugs.   A sentence of 168 months accomplishes all of these goals of sentencing: punishment, public protection and deterrence.

To that end, a sentence of 168 months sends a strong deterrent message of what can be expected for those who deal fentanyl and methamphetamine, carry firearms, and profit from the misery of persons addicted to controlled substances. This is especially true of the message sent to the regular players in drug organizations, like the Defendant, who was not in charge and still faces significant jeopardy for his role.

Moreover, this Defendant is also well known in Lynn, both to gang members, and other drug offenders in the Boston area. His sentence and the sequence of federal involvement in this case will serve as an example and warning. While there is the potential for mitigation for those without lengthy criminal histories, even those facing a first conviction will be held accountable with far more than a decade in prison when they deal significant quantities of drugs and wield firearms.

Had this Defendant not elected to plead guilty to a serious sentence and demonstrated a willingness to accept responsibility and a justly deserved punishment, he could have expected to spend significantly more time in prison for the amount of drugs he distributed and firearms he possessed as a member of this DTO. He can certainly expect to spend additional years in prison if he reoffends on supervised release. This too is a message of deterrence achieved by this sentence.

This sentence called for by the government, which is 14 years for a first-time felon will also protect the public from this Defendant and the DTO for the foreseeable future. Moreover, this relatively lengthy sentence for a first offense will also hopefully curb the potential that the Defendant returns to crime in the future, further protecting the public. Lastly, the swiftly imposed 168-month sentence -- given the Defendant's acceptance of responsibility, uncontested detention, and willingness to plead guilty without any litigation -- certainly promotes respect for the law. \

## **CONCLUSION**

Based upon the foregoing, the government requests that the Court impose a sentence of 168 months, followed by five years of supervised release.

Respectfully submitted,

LEAH B. FOLEY,
United States Attorney

By:    */s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney

Date:   May 4, 2025