UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Crim **No. 1:23-cr-10297-2-PBS** |
| | ) |
| SEBASTIEN BEJIN | ) |

## DEFENDANT'S SENTENCING MEMORANDUM

Now comes the defendant, Sebastien Bejin (hereinafter "Mr. Bejin"), before this Honorable Court and respectfully submits the following Sentencing Memorandum in support of his request that this Court impose a sentence of 144 months of imprisonment with five years of supervised release. Mr. Bejin is an essential and adored part of his community, and a man with a solid plan to pursue employment in the electrical and computer engineering trades. He has long demonstrated a talent for empowering and enriching the lives of his family and community alike, and wants to impart the lessons he learned from his fall from grace to them in the future, in an effort to repay them for the impact that his foray into criminal conduct has had upon them. A sentence of 144 months of imprisonment followed by five years of supervised release is sufficient but not greater than necessary to achieve the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

### Background

Loved ones describe Mr. Bejin as a man who has imparted values such as "big hearted, a pillar of support, hard-working, ambitious and resilient." (Exhibits C, D, E, G, H). His letters of support overwhelmingly demonstrate an

1

individual who is truly loved and admired for how he has enriched their lives in many and diverse ways, but also acknowledge that the unnatural detour into a period of criminality was undoubtedly the product of the circumstances and experience of the death of his mother, with whom he was very close, and the traumatic impact that tragically altered the course of his behaviors, and, ultimately, his life.

Sebastien Bejin (hereinafter "Mr. Bejin") was born in Brooklyn, New York on November 5, 1990, but moved to Port-au-Prince, Haiti with his family a few months after his birth. PSR ¶ 157.  He lived with his father, Jean Bejin, who ran an auto parts business, his mother, Mary Ainge Bejin, who helped his father run their auto parts business, but later became a pharmacist, and his older sister, Christina Giovanni Bejin, who is now a pediatric nurse practioner at Boston Medical Center. PSR ¶¶ 159, 160.  Mr. Bejin describes his early childhood as great, with sleepovers at his grandmother's house, and close relationships with other members of his family. PSR ¶ 158.  Sadly, Mr. Bejin experienced his first exposure to trauma when his father unexpected passed away from a heart attack when he was three-years old. PSR ¶¶ 159.  Nonetheless, Mr. Bejin's mother, who was always his emotional lode star, was able to help young Mr. Bejin to work through his traumatic bereavement by keeping him uplifted and focusing upon the positivity and possibility of life's journey.  Athletically gifted, Mr. Bejin channeled his energies into soccer, basketball, and football, his schooling, and maintaining relationships with friends and family. PSR ¶ 158.

When Mr. Bejin was fourteen years old, his mother moved her family to the United States for a better economic opportunity for herself and her children, where she went to school for and became a licensed pharmacist. PSR ¶ 158. Mr. Bejin had trouble adjusting to his new life and learning a new language at an age which, on its own terms, has emotional growth challenges, but, nonetheless, succeeded academically and athletically. Nathaniel Guy, who has known Mr. Bejin for twenty years, describes Mr. Bejin as "one of the most compassionate individuals I have ever met." See Exhibit I – Guy letter of support. Mr. Guy described the leadership traits that Mr. Bejin demonstrated with his fellow football athletes in high school. "From the first day I met him during the summer of 2006 at football training camp he would make sure everyone was taken care of. Whether it was the underclassmen waiting for water or holding everyone accountable from top to bottom when I came to holding the tackling pads. Sebastien made sure to instill his integrity and hard work in every teammate. The coaches noticed and without any hesitation made him a team captain." See Exhibit I – Guy letter of support.

Frances Mathieu, who currently serves as the Director of Outpatient Services at Arbour Hospital, met Mr. Bejin two decades ago at church where Mr. Bejin served as an altar boy when Mr. Mathieu and his family had recently moved from Haiti. He made Mr. Mathieu feel welcome and unofficially tutored Mr. Mathieu so successfully that Mr. Mathieu was able to get into more advanced classes. Mr. Mathieu wrote that "[m]ost people knew Sebastien as an athlete. I know Sebastien the scholar...He'd talk about his dream to use his

language skills to get a degree in international business. He had a vision and a bright future ahead. The teachers loved him." See Exhibit L – Mathieu letter of support.  Mr. Bejin and a fellow classmate from Lynn Classical High School made the front page of The Lynn Journal on July 9, 2009 where, as football players and Agganis Allstars, they are pictured at South's team first practice in anticipation of the Agganis Classics Week championship.  See Exhibit S – Photograph of Sebastien Bejin and Quivari Jackson.

Mr. Bejin graduated from Lynn Classical High School in 2008 with a full football scholarship to Husson University in Bangor, Maine, where in addition to playing football for the university, he majored in international studies from September 2, 2008 to December 8, 2008. PSR ¶ 175.  His future appeared bright and full of possibilities when tragedy struck his life.  Mr. Bejin's mother's physical health became compromised by her debilitating heart problems and she had to be fitted for a pacemaker. PSR ¶ 175.  Mr. Bejin, who was glued to her hip and with whom he had a very deep emotional bond, took a leave of absence from university to care for her. PSR ¶ 175.  Mr. Bejin's mother was his best friend and he would do anything for her. He moved in with his mother and took a job that was close to their home in order to be available to her on an emergency basis.  On January 24, 2010, Mr. Bejin was at working and thinking about the birthday celebration that he had planned for his mother later that day, and the cake that he was going to pick up for her on his way home from work. Instead, he got a call that she had been admitted emergently to the hospital. He immediately left work and went to the hospital

4

but inadvertently went to the wrong entrance.  When he found her room, her eyes were closed and he spoke to his mother for twenty minutes, not realizing that she was already deceased. It was only when a nurse came in and asked him what he was doing that he understood that his mother was gone, having died from a heart attack from which she could not be revived.  She would have been fifty years old on the same day that she passed away. PSR ¶ 160.

There is an overarching theme and agreement amongst Mr. Bejin's letters of support from members of his family and community that know him the best that the untimely death of Mr. Bejin's mother had a profound and deleterious effect upon his psyche and can provide the court with an understanding of the direct through line from Mr. Bejin's bright path towards success and prosperity to a dark offramp towards the offense conduct herein.  According to his sister, Christina Giovanni Bejin, "[h]e had such grief and pain that he shut out the whole family, dropped out of school, and because depressed." PSR ¶ 165.

In the immediate aftermath of his mother's death, Mr. Bejin did not want to be alive, did not care what happened to him and he wanted to be reunited with his mother, however he never took any steps towards materializing his brief thoughts of suicide ideation. PSR ¶ 169. Instead, although Mr. Bejin continued to work, he began drinking alcohol as a coping mechanism, which changed his personality from one of gregariousness to moody and argumentative. PSR ¶ 171.  His alcohol consumption interfered with his work, causing him to arrive late for work or miss work entirely, which was a markedly different characteristic from his previously ambitious and driven

work ethic. PSR ¶ 171.  Mr. Bejin did not seek counseling because it is generally not encouraged accepted within Haitian culture although he now readily acknowledges that he needs to receive professional services to deal with his untreated bereavement trauma.

Unfortunately, with the absence of his mother and his inability to process his pain and grief, the siren call towards negative influences eventually became too difficult for him to overcome.

Nonetheless, Mr. Bejin tried to maintain steady employment and live a normal, non-criminal life. From 2009 to the day of his arrest, he was employed by Dunkin' Donuts, Benchmark Senior Living at Putnam Farm, Tobin & Sons Moving and Storage, and Ironwood Work, working in event set-up work for functions and concerts and Fenway Park.  PSR ¶¶ 177-182.

Mr. Bejin also attended the New England Tractor Trailer Training School in North Andover from May to October 2022 and graduated from their CDL program.  He took but failed his first attempt at the CDL test but he had been practicing and waiting to retake the test when he was arrested for instant offense. PSR ¶ 175.

There is no question that Mr. Bejin's involvement in the instant offense is entirely a reflection his life before and after the death of his mother that sharply contrast his life of drive, ambition and achievement with the trajectory of his rapid descent into severe depression, emotional insulation, and poor decision making that ultimately resulted in his involvement with the instant case.

6

## **Applicable Guidelines**

On January 15, 2025, Mr. Bejin pled guilty to two counts of a three count indictment charging him with one count of Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute and Manufacture Cocaine, 400 Grams or More of Fentanyl, 500 Grams or More of Methamphetamine, and other Controlled Substances in violation of 21 U.S.C. §846 and 21 U.S.C. §841(b)(1)(A),  and one count of Conspiracy to Distribute and to Possess with Intent to Distribute Cocaine, 400 grams or more of fentanyl, 500 Grams of more of Methamphetamine, and Other Controlled Substances in violation of 21 U.S.C. §841(a)(1) and §841(b)(1)(A), and Dealing in Firearms without a License in violation of 18 U.S.C. §922(a)(1)(A). The Government agreed to dismiss Count 3, which charged him with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. §924(c)(1)(A). There is a binding plea agreement pursuant to Rule 11(c)(1)(C) following the imposition of the sentence. The Parties agrees with Probation's computation of his total offense level of 39, as represented in his final Presentence Report within Paragraphs 126 – 140.  The plea agreement calls for a range of sentence imposition between 144 and 168 months.

Under 18 U.S.C. § 3553 (a), the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in Section 3553(a)(2).  In so doing, a sentencing court "may not presume that the Guidelines range is reasonable" but, instead, must use the factors set forth in § 3553 (a), to "make an individualized assessment based

on the facts presented." <u>Gall v. United States</u>, 128 S.Ct. 586, 596 (2007). Thus, district courts are now permitted to and, in the appropriate case, directed to consider whether disagreement with the Sentencing Commission's underlying policy results in a sentence that is unreasonably high. <u>Kimbrough</u>, <u>supra</u>, 128 S.Ct. at 575; <u>United States v. Boardman</u>, 528 F.3d 86 (1st Cir. 2008); <u>Martin</u>, <u>supra</u>, 520 F.3d at 93-94.

The First Circuit has stressed that <u>Kimbrough</u> requires a "more holistic inquiry" than simply relying on the sentencing guidelines and that "section 3553 (a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the tread of an overarching principle." <u>United States v. Yonathan Rodriguez</u>, 527 F.3d 221, 228 (1st Cir. 2008). That overarching principle is to "impose a sentence sufficient but not greater than necessary." <u>Id.</u> In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is <u>minimally</u> sufficient to achieve the broad goals of sentencing." <u>Id.</u> (Emphasis added).

In this case, the now-familiar §3553 (a) factors dictate a sentence of 144 months of a term of imprisonment and five years of supervised release.

**1.    The Nature and Circumstances of the Offense and the History and Characteristics of the Offender**

**(a) Nature and Circumstances of Offense**

The offense conduct here is objectively serious, and Mr. Bejin will and should serve a lengthy sentence but that is also fairly counterbalanced with Mr. Bejin's productive and meaningful life prior to his involvement with the instant

8

offense and his prodigious and successful efforts to engage in educational and rehabilitative programming during his term of pretrial detention at Wyatt Detention Center since his arrest on November 1, 2023.  See Exhibit B – Letter from Wyatt Detention.

There is no question that this *significant* misstep has made an indelible imprint upon his life, but Mr. Bejin has redoubled his efforts to prove himself worthy of redemption to this Court, and the sentence recommended in his Sentencing Memorandum is the appropriate sentence to be imposed. Second chances should only be given when a Defendant has proved himself worthy of that honor by engaging in objectively measurable expectations of appropriate rehabilitative efforts for a measurable period of time.  This is evidenced by the number of programs in which Mr. Bejiin has participated in during his period of pretrial detention, including over two hundred programs and classes such as but not limited to Adjustment to Incarceration, Living with Others, Criminal Lifestyles, Rational Thinking, Anger Management, Stress Management, Smart Recovery, Parenting Class, and over 200 E-courses through CyperWorx.  He maintains a positive attitude, participates in Wyatt's worker program wherein he demonstrates initiative, a good work ethic, and has received positive work evaluations. Mr. Bejin has remained discipline free since the beginning of his pretrial detention.  See Exhibit B – Letter from Wyatt Detention Center. There is no question that Mr. Bejin has taken every opportunity provided to him to prove his willingness to work hard, learn from his mistakes, and provide himself with the tools to avoid any possible recidivism in the future.

### (b) Mr. Bejin's History and Circumstances

Mr. Bejin's personal history and circumstances have been extensively and fulsomely addressed in his Sentencing Memorandum and in his comprehensive and detailed Presentence Report. Given these positive prognostic signs, as described herein, and the circumstances of the nature of his participation in the offense at issue, a sentence at the low range of the Plea Agreement, namely 144 months with five years of Supervised Release will be sufficient but not greater than necessary to effectuate the sentencing goals of 18 U.S.C. § 3553 (a).

**2.     The Need for the Sentence Imposed to Promote Certain Statutory Objectives:**

**(A)     to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense**

The offense conduct here is serious.  The sale of illegal narcotics has ravaged many communities in this country.  In these circumstances, however, the Court should consider whether a sentence of 144 months, a sentence at the low end of the sentencing range contemplated by the Plea Agreement will be significant enough punishment which will far better reflect the seriousness of the defendant's conduct within the aggregate factors of 18 U.S.C. § 3553 (a).

It is clear that Mr. Bejin has successfully demonstrated to this court that he can and has righted his ship.  Not only has he availed himself of all educational and employment opportunities at Wyatt Detention as described herein, he has make concrete and identifiable plans upon his release to continue his rehabilitative journey.  He plans to pursue the trade of Electrical and

Computer Engineering, and has taken courses during his pretrial detention in service of those ambitions.

Coupled with his abundant resource of new life skills, coping mechanisms and a solid work plan, Mr. Bejin will also return to an extended community of family and friends who support him in his next journey and keep him on the straight and narrow, as evidenced by their letters of support.  He has also been in a committed relationship with Sash Tavarez, his partner for several years, and she is waiting to welcome him with open arms upon his return.  Ms. Tavarez is a full-time manager at a hair salon on Newbury Street, she has two boys with whom Mr. Bejin has deep bonds through his participation with their afterschool sports and general life activities. Mr. Bejin and Ms. Tavarez hope to be able to start an additional family of their own upon his release.  See Exhibit M – Tavarez Letter of Support. Mr. Bejin has an extraordinary safety net that will propel him towards success.

It is not extended incarceration that will benefit Mr. Bejin and the community at large, but the opportunity to continue to allow Mr. Bejin prove himself and thrive as he has done so. As a society, this should be how we not only pay it forward for the ones entrusted in our care who lost their way and need our guidance and support, but also for the benefit of our/their community as a partnership to ensure everyone's success and safety.

The public's right to just punishment for the offense is vindicated by Mr. Bejin's willingness to accept responsibility for his criminal conduct, his conviction and punishment by a reasonable sentence that is consistent with his

criminal history, and his objective commitment to showing the Court that he wants to ensure that his behavior is never repeated. And most of all, the Court can feel confident that Mr. Bejin has earned the trust of the Court by his conduct during his pretrial detention that suggests that the sentence requested by him benefits not only Mr. Bejin but also society at large;

**(B)    to afford adequate deterrence to criminal conduct**

There can be little doubt that the period of incarceration that Mr. Bejin has and will continue to endure will provide overwhelming deterrence to any thought of relapse in the future. As a matter of general deterrence, the efficacy of sentence of more than 144 months of incarceration is unsupported.

Past studies have found parentally bereaved adolescents at greater risk for a wide array of adjustment problems compared to their non-bereaved counterparts. They have been found to have a greater risk of premature death (Li, Verergaard, Cnattingius, Gissler, Hammer Bech, Obel, & Olsen, 2014), suicide attempts (Jakobsen & Christiansen, 2011), to experience depression (Jacobs & Bovasso, 2009; Yagla Mack, 2001), to have more severe and greater numbers of other psychiatric difficulties, (Dowdney, 2000), to have lower grades and more school failures (Berg, Rostila, Saarela & Hjern, 2014), lower self-esteem (Worden & Silverman, 1996), greater involvement in youth delinquency,(Draper & Hancock, 2011), more drug abuse (von Sydow, Lieb, Pfister, Höfler, & Wittchen, 2002) and more violent crime involvements (Wilcox, Satoko, Kuramoto, Lichtenstein, Långström, Brent, & Runeson, 2010).

Most studies of the effects of parental loss have focused primarily upon adolescent populations, often obtaining consistent associations with the above mentioned correlates and parental death.[1] Mr. Bejin has taken steps to acknowledge and address his bereavement trauma by acknowledging the need for therapy, and continued engagement with and acquiescence of support from his family, partner and community.

### (c) to protect the public from further crimes of the defendant

In evaluating the likelihood of recidivism, peer-reviewed psychologists maintain that certain dynamic factors account for "criminogenic needs," including criminal peers, criminal history or history of antisocial behavior, social achievement, and family structure.[2]  Additionally, criminal companions, antisocial attitudes and current employment and educational problems are all strong predictors of recidivism. Other studies of recidivism's causes have maintained that poor engagement in non-criminal pursuits — such as employment and education — are risk factors for criminal recidivism.[3] A number of researchers have conducted recidivism studies as a means of determining if certain treatment programs are effective in reducing recidivism. Peer group influence, according to these studies, is one powerful predictor of recidivism, albeit one more prevalent in youth offenders than older adults.[4]

---

[1] https://pmc.ncbi.nlm.nih.gov/articles/PMC7219956/ Examining longer-term effects of parental death in adolescents and young adults: Evidence from the National Longitudinal Survey of Adolescent to Adult Health

[3] Id https://www.simplypsychology.org/recidivism.html

[4] Id https://www.simplypsychology.org/recidivism.html

Applying these metrics to Mr. Bejin's personal characteristics, the likelihood of recidivism is slim to none, particularly because Mr. Bejin has identified multiple safety nets that he plans to embed in his life to deter any further criminal conduct;

(d) **To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment...**

Mr. Bejin has fully described his ongoing efforts to improve himself that have been supported by the exhibits submitted here.

**C)     A Compassionate and Fair Sentence is Consistent with the Factors Set Forth in 18 U.S.C. § 3553 (a) and Will Avoid Unwarranted Sentence Disparities among defendants with similar records who have been found guilty of similar conduct in order to Effectuate the Purposes of Sentencing**

Consistent with the factors set forth in 18 U.S.C. § 3553 (a), the Court must consider the impact of sentencing disparities among defendants with similar records who have been found guilty of similar conduct. His co-defendants remain unsentenced but given the relatively brief period of time of Mr. Bejin's involvement with Mr. Garcia and Mr. Garcia's vast network of associates, a sentence of 144 months is designed to avoid unwanted sentencing disparities

**D)     A Compassionate and Fair Sentence is Consistent with the Factors Set Forth in 18 U.S.C. § 3553 (a) and Will Result in a Sentence that is Sufficient, but Not Greater than Necessary, to Effectuate the Purposes of Sentencing**

14

The Court has broad discretion to question and ameliorate the guideline range where, as here, the consequences of the Sentencing Commission's policy are, unsupported by past sentencing practices, and lead to a result inconsistent with the sentencing goals expressed in 18 U.S.C. § 3553 (a). Martin, supra, 520 F.3d at 88-96 (approving 91 month downward variation from career offender guideline; "Kimbrough...opened the door for a sentencing court to deviate from the guidelines in an individual case even though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission.") See also U.S. v. Bryant, 571 F.3d 147, 153 (1st Cir. 2009)(§ 3553 (a) (factors, in context of "enormous" disparity between career offender and otherwise applicable guideline, justified variance).  That discretion is at its apex where a particular guideline appears poorly supported empirically, perhaps suggesting an abdication of the Sentencing Commission's institutional role; in such a case the sentencing court's institutional advantage makes it far better suited to craft a just sentence.  Kimbrough, supra 128 S.Ct. at 567, 574.  See also Gall, 128 S.Ct. at 598 (recognizing institutional advantage of experienced district court judges who "see so many more Guidelines sentences than appellate courts do")(citing Koon v. United States, 518 U.S. 81 (1996)).

Finally, like many courts, this Court should give limited consideration to the Government's sentencing request and instead impose a sentence that more adequately considers all of the goals of sentencing as captured in the 18 U.S.C. § 3553(a) factors as stated herein, and as applied to Mr. Bejin's history and

characteristics. Those factors militate a sentence of 144 months of imprisonment, five years of supervised treatment, and conditions of supervised release as this Honorable Court deems appropriate.

## CONCLUSION

For the foregoing reasons, this Court should impose a sentence of 144 months, five years of supervised released, a recommendation for RDAP, and other conditions of supervised release as to this Court seems just and proper.

Respectfully Submitted,
Sebastien Bejin
By his counsel,

Date: 05/06/2025

/s/ Vivianne Jeruchim
Vivianne Jeruchim, Esq.
BBO #547598
Jeruchim & Associates, P.C.
6 Beacon St., Suite 825
Boston, MA  02108
617 312-2255
aviva@jeruchimlaw.com

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on May 6, 2025.

Date: 05/06/2025

/s/ Vivianne Jeruchim
Vivianne Jeruchim, Esq.

16